Jb8WmayH

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
3   SANDRO MAYORAL-CLIMICO,
    et al.,
4
                 Plaintiffs,
5
            v.                      16 Civ. 7079 (JGK)(KNF)
6
    PAPA FRESH, INC., et al.,
7
                 Defendants.
8                                   Hearing
    ------------------------------x
9                                   New York, N.Y.
                                    November 8, 2019
10                                  1:30 p.m.
11  Before:
12              HON. KEVIN NATHANIEL FOX,
13                                  U.S. Magistrate Judge
14                     APPEARANCES
15  TROY LAW PLLC
        Attorneys for Plaintiffs
16  BY:  AARON B. SCHWEITZER
17
18
19
20
21
22
23
24  Also Present:  Luis Lopez, Interpreter (Spanish)
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Jb8WmayH

1          (Case called)

2          MR. SCHWEITZER:  Good afternoon, your Honor.  May it

3   please the Court.  Aaron Schweitzer, Troy Law PLLC, for the

4   plaintiffs.

5          THE COURT:  Good afternoon.

6          You have a person seated with you at counsel table.

7          MR. SCHWEITZER:  Yes, your Honor.

8          Seated next to me is Sandro Climico, one of the

9   plaintiffs in this action.  Seated next to him is Mr. Lopez,

10  the interpreter.

11         On the screen is Juan Carlos Sanchez Andrade, and

12  there is one further plaintiff who is running late.

13         THE COURT:  Good afternoon to all of you.

14         The Hon. John G. Koeltl referred this case to me to

15  conduct an inquest in order to determine the amount of damages,

16  if any, that should be awarded to the plaintiffs against the

17  defendants, Papa Fresh, Inc., doing business as Papa John's;

18  Richard Schragger; and Alice McLamb.  The plaintiffs have

19  previously made submissions to me in connection with the

20  inquest, and we are today scheduled for a hearing at which

21  evidence will be presented in support of the plaintiffs'

22  request for damages.

23         Would you swear the interpreter, please.

24         (Interpreter sworn)

25         THE COURT:  Thank you.

1           Mr. Schweitzer, do you wish to proceed?

2           MR. SCHWEITZER:  I believe it would be best to start

3    with Mr. Sanchez Andrade, who is here by video link.

4           THE COURT:  All right.  Please begin.

5           MR. SCHWEITZER:  I would ask that since he is here by

6    video link, that the interpretation between English to Spanish

7    and Spanish to English be spoken up so that he can hear it.

8           THE INTERPRETER:  Of course.

9           THE COURT:  Are you calling him as a witness now?

10          MR. SCHWEITZER:  Yes.

11          THE COURT:  All right.

12          MR. SCHWEITZER:  At this time I would ask to call

13   Mr. Sanchez Andrade as a witness.

14    JOSE CARLOS SANCHEZ ANDRADE,

15        Plaintiff, called as a witness in his own behalf,

16        having been duly sworn, testified through the

17        Spanish-language interpreter as follows:

18          THE COURT:  You may inquire.

19          MR. SCHWEITZER:  Thank you, your Honor.

20   DIRECT EXAMINATION

21   BY MR. SCHWEITZER:

22   Q.  Good afternoon, Mr. Sanchez Andrade.

23       Are you familiar with --

24   A.  Good afternoon, sir.

25   Q.  Are you familiar with a Papa John's restaurant?

Jb8WmayH                        Sanchez Andrade - Direct

1    A.  Yes.

2    Q.  How are you familiar with it?

3    A.  I worked in Papa John's.

4            THE INTERPRETER:  It has to be a little -- I can't

5    hear -- thank you.

6            THE COURT:  Sir, would you repeat your answer to the

7    question.

8            THE WITNESS:  I know Papa John.  I worked as a

9    delivery man, delivering pizza.

10   BY MR. SCHWEITZER:

11   Q.  Where was that Papa John's located?

12   A.  89 Amsterdam.

13   Q.  Just to be clear, is that the address, 89 Amsterdam Avenue,

14   or is that the intersection, 89th Street and Amsterdam Avenue?

15   A.  It's Amsterdam, Broadway and Amsterdam, No. 89.

16   Q.  And from when to when did you work at that location?

17   A.  I worked there five days a week.

18   Q.  I'm sorry.  I should have been clearer.

19       From what date did you start and what date did your

20   employment end?

21   A.  From June of 2013 to November 2015.

22   Q.  And how did you learn about the job available at Papa

23   John's on or around June 2013?

24   A.  I was looking for work, and I came across that Papa John's

25   when they had a sign in the front that said they were looking

Jb8WmayH                        Sanchez Andrade - Direct

1   for delivery people.

2   Q.  And what did you do then?

3   A.  I asked the person in charge at Papa John's if there was

4   work available for me, and he told me yes.

5   Q.  Who was that person in charge that you spoke to?

6   A.  Jaime Roman was the manager in charge.

7   Q.  And when you and Mr. Roman spoke about the job, what, if

8   anything, did Mr. Roman tell you about your wage rate, how much

9   money you would make?

10  A.  He told me that the pay's going to be $5.65 per hour.

11  Q.  And did he explain to you that you would be making less

12  than the ordinary minimum wage because you would receive tips?

13  A.  Yes.  He told me I was going to earn tips, and that was the

14  minimum wage.

15          THE COURT:  I've given you some leeway in examining

16  the witness, but you should refrain from presenting leading

17  questions to him as you continue to examine him.

18          MR. SCHWEITZER:  I will keep that in mind.  Thank you,

19  your Honor.

20          THE COURT:  I notice the interpreter did not

21  interpret.

22          THE INTERPRETER:  I interpreted it for the gentleman

23  on my right, sir.

24          THE COURT:  Everything that is said should be

25  interpreted so that the witness can participate fully with us,

Jb8WmayH                         Sanchez Andrade - Direct

1   please.

2   BY MR. SCHWEITZER:

3   Q.   What, if anything, did Mr. Roman tell you about how many

4   days you would work a week?

5   A.   Five days per week.

6   Q.   What days, if any, did he tell you you would be working?

7   A.   He told me days that I would work and days that I would be

8   off.

9   Q.   Which days did he say you would work and which days did he

10  say --

11  A.   I was going to take off Monday, Tuesday, work Wednesday,

12  Thursday, Friday, Saturday, and Sunday.

13  Q.   And what hours did Mr. Roman say you were going to work

14  Wednesday, Thursday, Friday, Saturday, and Sunday?

15  A.   From 10 a.m. to 5 p.m.

16  Q.   For each of the days, Wednesday through Sunday?

17  A.   Yes.

18  Q.   OK.  When you were hired, did Mr. Roman give you a piece of

19  paper with your wage rate printed on it?

20  A.   No.

21          THE COURT:  I have cautioned you about putting leading

22  questions to the witness.  You should refrain from doing so.

23  BY MR. SCHWEITZER:

24  Q.   After you started working, what schedule did you ultimately

25  work?

1   A.  Ten in the morning to 5 p.m.

2   Q.  How many days per week and which days?

3   A.  Five days per week.  Wednesday, Thursday, Friday, Saturday,

4   and Sunday.

5   Q.  How often were you paid?

6   A.  I got paid every week.

7   Q.  And by what method were you paid; that is, by check, by

8   cash, by direct deposit, or some other way?

9   A.  They paid me by check.

10  Q.  And when you received your checks, what other paper, if

11  any, did you receive?

12  A.  They would give me my check, and they would give me my tips

13  in cash.

14  Q.  OK.  Besides your check and your tips in cash, what other.

15   piece of paper, if any, did you receive with your pay?

16  A.  The only thing that they said the paper was was my fees.

17  Q.  And what did that piece of paper say?

18  A.  It just indicated the hours that I worked.

19  Q.  While you were working at Papa John's, how were your hours

20  tracked, if at all?

21  A.  They would know my hours because I had a card that I would

22  check in from ten to five, but I used to arrive at 8:00 in the

23  morning to clean the restaurant.  Between eight and ten I would

24  clean.

25  Q.  And when you arrived at 8:00 in the restaurant, when would

Jb8WmayH                          Sanchez Andrade - Direct

1  you punch your card?

2  A.  At ten in the morning.

3  Q.  What were your duties from day to day at Papa John's?

4  A.  In the morning I would come in, I would be charged with

5  cleaning the restaurant, doing the windows, taking out the

6  garbage, cleaning the basement, making the boxes for Papa

7  John's.

8  Q.  And how long on a typical day would you spend doing those

9  things?

10  A.  I would do that between two and three hours a day, five

11  days.

12  Q.  And for the remainder of your time, what were you doing?

13  A.  When we come back from doing deliveries, we'd also be in

14  charge of cleaning the tables, cleaning the bathrooms, and the

15  street also.

16  Q.  For which of your duties did you earn tips, if any?

17  A.  I only earned tips on the cash deliveries.

18  Q.  When you received your pay at the end of the week, how, if

19  at all, was your time tracked differently for tipped and

20  nontipped work?

21  A.  I used to make a list of all the deliveries I made and the

22  tips that I earned, and I was supposed to get a week -- about

23  710 was supposed to be my check, and my check would come up to

24  610.

25  Q.  Why was that, if you know?

Jb8WmayH                          Sanchez Andrade - Direct

1   A.  Like I said, I used to calculate my tips, and my check

2   should have came up to 710, and it would come up to 610.

3   Q.  To your knowledge, what was the reason it came up short?

4   A.  My check would come up short because I already had the list

5   of what I should have gotten.

6   Q.  OK.  From the time you were hired to the time you left Papa

7   John's, did there come a time when your base wage, before tips,

8   changed?

9   A.  I know that sometimes there was changes sometimes there

10  weren't changes.

11  Q.  All right.  When did your wage rate change, and what did it

12  change to?

13  A.  My rate changed when I made tips and I didn't get paid as

14  much tips as I was supposed to.

15  Q.  Let me try and be clearer.

16      Did there come a time during your employment when your

17  hourly rate before tips changed from what you started?

18  A.  Yes, my salary changed.

19  Q.  All right.  When did it change?

20  A.  It changed from 5.25 to 6.25.

21  Q.  And when did it do that?

22  A.  That change happened after working five months for Papa

23  John's.

24  Q.  OK.  And how did you learn that your wage rates changed?

25  A.  We found out when the manager told us he was going to raise

1   the hourly rate a little bit.

2   Q.  Did the manager tell you that verbally or in writing?

3   A.  He told us verbally.

4   Q.  Are you familiar with a person named Richard Schragger?

5   A.  Yes.  He's my boss.

6   Q.  How do you know he's your boss?

7   A.  Yes, Richard.  He was my boss.  He was my boss when the

8   manager sent me to him.

9   Q.  How often did you see him at Papa John's?

10  A.  I would see him Friday, Saturday, and Sunday.

11  Q.  And what would he do in the restaurant?

12  A.  He would bring us our checks and supervise the restaurant

13  to make sure that it was very clean.

14  Q.  When you say supervise the restaurant, what do you mean?

15  A.  He would supervise, check the restaurant, make sure it's

16  clean; the bathrooms, the basement, the windows, and the street

17  are all clean.

18  Q.  Are you familiar with an individual named Alice McLamb?

19  A.  Can you ask me the question again?

20  Q.  Are you familiar with an individual named Alice McLamb?

21  A.  Yes.

22  Q.  Who was that?

23  A.  I know her as a person that would come to the restaurant

24  also to check to make sure everything is clean.

25  Q.  How often would she come to the restaurant?

1   A.  She would also come Friday, Saturday, and Sunday.

2   Q.  And you mentioned that she would make sure the restaurant

3   was clean.  What would that entail?  What would she do?

4   A.  She would supervise and make sure that everything was

5   clean, and she would also check the refrigerators to make sure

6   they were clean.

7   Q.  Did she ever have cause to speak to you?

8   A.  Yes.  She would tell me -- she would talk to me to let me

9   know that everything should be in order, especially the

10  bathrooms, the basement, the tables; make sure the garbage was

11  taken out.

12  Q.  How, if at all, did your pay change if you worked more than

13  40 hours in a week?

14  A.  Yes, I would see my check change.  I would work from ten to

15  five.  I'd punch my card in at ten and punch out at five.  I'd

16  usually stay one hour more to make sure everything is clean.

17  Q.  When you say stay one hour more, what do you mean by that?

18  A.  I mean to say that after five I would stay longer, before I

19  left, to make sure everything was clean.  That hour I would

20  stay, they did not pay me.

21  Q.  On the days when you stayed after five, what time did you

22  clock out?

23  A.  I didn't punch anything because I already had punched.

24  Q.  What time were you saying you already punched?

25  A.  At 5 p.m.  After five, I would work one additional hour to

1    make sure that the basement, the bathroom is clean, and the

2    garbage is taken out.

3    Q.  What languages do you read, if any?

4    A.  Just Spanish.  I don't know English.

5    Q.  Earlier you mentioned a paper that you received when you

6    were hired.  To your knowledge, what language was that paper

7    in?

8    A.  In English.

9    Q.  And you mentioned also that you received certain papers

10   with your paycheck.  What language were those papers in?

11   A.  In English.

12           MR. SCHWEITZER:  Nothing further for this witness,

13   your Honor.

14           THE WITNESS:  OK.

15           THE COURT:  Mr. Sanchez Andrade, what is the total

16   amount of money that you say you are owed based upon your

17   employment with the defendant Papa John's located at, as you

18   indicated, 89 Amsterdam and Broadway?

19           THE WITNESS:  Well, the total would be, the total

20   would be a hundred dollars that they took out every week from

21   me.

22           THE COURT:  The $100 that was taken from you each

23   week, what did those hundred dollars represent?

24           THE WITNESS:  That represents the total amount that I

25   should have gotten.  A hundred dollars, to me, that's a lot of

Jb8WmayH                        Sanchez Andrade

1   money.  A hundred dollars a week they took out.

2              THE COURT:  The deliveries that you made while you

3   were working, how did you make those deliveries?

4              THE WITNESS:  By bicycle.

5              THE COURT:  How did you get the bicycle that you used

6   to make the deliveries, sir?

7              THE WITNESS:  I had to buy that with my own money in

8   order to work for Papa John's.

9              THE COURT:  What amount of money did you have to pay

10  for the bicycle that you used to make your deliveries, sir?

11             THE WITNESS:  $150.

12             THE COURT:  Throughout your employment by Papa John's,

13  did you use one bicycle?

14             THE WITNESS:  Two bicycles, one regular bicycle and

15  one electric.

16             THE COURT:  When you indicated you spent $150 for a

17  bicycle, was that one bicycle or two?

18             THE WITNESS:  For one bicycle.

19             THE COURT:  Which bicycle cost $150?

20             THE WITNESS:  The regular one.  The regular one, the

21  one that's not electric.

22             THE COURT:  How much was the cost of the electric

23  bicycle if you recall?

24             THE WITNESS:  Yes, the electric one cost me $500.

25             THE COURT:  When you began working for Papa John's,

1    did you buy a bicycle immediately?

2              THE WITNESS:  Yes, I had to buy a bicycle immediately.

3              THE COURT:  Which bicycle did you purchase

4    immediately, the regular bicycle or the electric bicycle?

5              THE WITNESS:  The normal one.

6              THE COURT:  Did you use both the normal, as you've

7    described it, bicycle and the electric bicycle together at any

8    point while you were working for Papa John's?

9              THE WITNESS:  When one would break down, I had the

10   other one to carry on, which would have been the electric one.

11             THE COURT:  How long after you began working for Papa

12   John's did you purchase the electric bicycle?

13             THE WITNESS:  In 2014.

14             THE COURT:  How long after you began working did you

15   purchase the electric bicycle in terms of months?

16             THE WITNESS:  Seven or eight months.

17             THE COURT:  Did Papa John's require you to purchase an

18   electric bicycle?

19             THE WITNESS:  Yes, because they wanted the deliveries

20   to be done as fast as possible.  That's why I bought an

21   electric bike, so my deliveries could be made in a fast manner.

22             THE COURT:  Who, if anyone, at Papa John's required

23   you to purchase an electric bicycle?

24             THE WITNESS:  The manager, Jaime Roman.  Yes.

25             THE COURT:  Was there anything wrong with your regular

1    bicycle at the time that you purchased the electric bicycle?

2           THE WITNESS:  Yes, it was -- it would break down a

3    lot, the tires and the chain, due to the fact that the

4    deliveries, some of them, were pretty far.

5           THE COURT:  How long after you began working for Papa

6    John did the regular bicycle break down, as you've just

7    described?

8           THE WITNESS:  It would break down almost every month,

9    maybe once or twice a month.  That's why I had to buy the

10   electric one, which was more resistant to breakdowns.

11          THE COURT:  Well, did you elect to buy an electric

12   bicycle because the regular bicycle broke down regularly?

13          THE WITNESS:  Yes.  Yes, because Richard told me that

14   the deliveries were taking too long, and he said I had to do

15   something and get a bicycle to make the deliveries faster and

16   make sure that the pizzas arrive to the people.

17          THE COURT:  When you indicated Richard had this

18   conversation with you, was that Richard Schragger?

19          THE WITNESS:  Yes.

20          THE COURT:  Other than requiring you to get the

21   electric bicycle, were there any other requirements that Papa

22   John's imposed upon you in connection with your work as

23   delivery person?

24          THE WITNESS:  Yes, besides that, he had us -- he

25   wanted us to get, with our own money, a vest, lights for the

Jb8WmayH                          Sanchez Andrade

1     bicycles, helmets for safety, and so that the police wouldn't

2     stop us.

3                   THE COURT:  The lights to which you made reference

4     would be for the bicycle?

5                   THE WITNESS:  Yes, they were for the bicycle.

6                   THE COURT:  Sir, do you know what Rich Foods 37 LLC

7     is?

8                   THE WITNESS:  No, I don't know what that is.  No.

9                   THE COURT:  Do you know what Wonka Holdings Corp. is,

10    sir?

11                  THE WITNESS:  No, I don't know what that is.

12                  THE COURT:  How many persons worked with you at the

13    Papa John's --

14                  THE WITNESS:  When I worked in Papa John's, there were

15    four or five people.

16                  THE COURT:  When I mentioned Papa John's, I was

17    referring to the location you indicated, 89 Amsterdam and

18    Broadway.  Did you understand that, sir?

19                  THE WITNESS:  Yes.

20                  THE COURT:  All right.  Thank you very much, sir.  I

21    have no more questions.

22                  THE WITNESS:  OK.  (in English)

23                  MR. SCHWEITZER:  Your Honor, may he stay on the line

24    if he wishes?

25                  THE COURT:  Certainly.

1          THE WITNESS:  Yes.

2          MR. SCHWEITZER:  All right.  Calling Sandro

3   Mayoral-Climico.

4          THE COURT:  Sir, would you take the witness stand.

5    SANDRO MAYORAL-CLIMICO,

6        Plaintiff, called as a witness in his own behalf,

7        having been duly sworn, testified through the

8        Spanish-language interpreter as follows:

9          THE COURT:  You may inquire of the witness.

10         MR. SCHWEITZER:  Thank you very much, your Honor.

11  DIRECT EXAMINATION

12  BY MR. SCHWEITZER:

13  Q.  Mr. Mayoral-Climico, are you familiar with the restaurant

14  Papa John's?

15  A.  Yes, I worked there.

16         MR. SCHWEITZER:  Just speak up, please.

17         THE WITNESS:  Yes, I worked at a Papa John's.

18  Q.  And where was the Papa John's where you worked located?

19  A.  89th Street and Amsterdam Avenue.

20  Q.  Besides the Papa John's location at 89th Street and

21  Amsterdam Avenue, have you worked at any other Papa John's

22  locations?

23  A.  I worked before there at a Papa John's about 20 blocks from

24  there.  In the 70s, around there.

25  Q.  Where was that located?

1   A.  It was called Iron Burger.

2   Q.  When did you begin working for the Papa John's located on

3   Amsterdam Avenue?

4   A.  Beginning of January.  I was there until May, five months

5   or so.

6              THE COURT:  Of which year, sir?

7              THE WITNESS:  2014.

8   BY MR. SCHWEITZER:

9   Q.  How did you learn about the job at the Papa John's at

10  Amsterdam Avenue?

11  A.  Asking around.

12  Q.  And what did you do when you learned of the job opening?

13  A.  I went to the store, I asked who was the person in charge,

14  and I asked them -- I told them I needed work in the mornings.

15  Q.  And who did you speak with?

16  A.  I don't think that the man in charge was available.  They

17  told me to come in the afternoon, and his name was Jaime.  He

18  interviewed me.  He told me yes, I could work and what days I

19  needed to work, and that's how I started to work.

20  Q.  And what days did Jaime tell you to work?

21  A.  I asked for five days.  I was off Tuesday and Thursday.

22  Q.  And from what time until what time on those days did Jaime

23  tell you you would be working?

24  A.  10:30 to 6 p.m.

25  Q.  And in that conversation, what, if anything, did Jaime tell

1   you about what you would be paid?

2   A.  He told me the minimum, but I don't remember the amount.

3   Q.  What, if anything, did he tell you about the relation

4   between your wage rate and the minimum wage rate?

5   A.  I don't understand the question.

6   Q.  Did he tell you that your wage rate would be above the

7   minimum wage, the minimum wage, below the minimum wage?

8   A.  He just told me I was going to earn X amount of dollars

9   plus tips.

10  Q.  And what was the X amount of dollars?

11          THE INTERPRETER:  I'm telling him to speak a little

12  louder.

13  A.  665, 765.  I'm not sure.

14  Q.  And what, if anything, did Jaime tell you that the minimum

15  wage was at that time?

16  A.  He may have told me, but I don't remember.

17  Q.  What, if anything, did he tell you about receiving tips as

18  a delivery person?

19  A.  What he told me?  He said I was going to receive tips, but

20  one day I saw the time, I noticed that he was discounting some

21  percentages and I asked him, and he said that the company

22  deducts 15 percent for them.

23  Q.  When did you notice that deduction and have that

24  conversation with Mr. -- with Jaime?

25  A.  That was about two months after.

1   Q.  After your hiring?

2   A.  Yes.  I had not seen him before.

3   Q.  All right.  Once you began working, what hours over the

4   course of a week did you actually work?

5   A.  40.

6   Q.  From what time to what time, on what days?

7   A.  That was from 10:30 a.m. to 6 p.m. Monday, Wednesday,

8   Friday, Saturday, and Sunday.

9   Q.  Was there a time clock in the restaurant?

10  A.  Yes.  We would punch in and out.

11  Q.  How soon after you arrived at the restaurant would you

12  punch in?

13  A.  When I go in, I punch and I go to work.

14  Q.  How soon after punching out would you leave the restaurant?

15  A.  I would take my deliveries, and then I would leave.

16  Q.  What were your duties at Papa John's?

17  A.  Well, I was hired to deliver pizza, but there was a lot

18  more work to do.

19  Q.  Like what?

20  A.  They wouldn't -- they would, like, see you standing around,

21  so they would have you sweep; clean, clean the fridge; make

22  boxes; put promotional coupons inside the boxes, all the boxes;

23  clean tables.

24  Q.  How much time on a typical day would you spend doing tasks

25  other than delivering pizzas?

Jb8WmayH                          Mayoral-Climico - Direct

1   A.  I would say maybe two to three hours.

2   Q.  And for those tasks did you receive tips?

3   A.  No.

4   Q.  How often were you paid?

5   A.  Every week.

6   Q.  And by what method were you paid; that is, by check, by

7   cash, by direct deposit, or some other way?

8   A.  By check.

9   Q.  What paper, if any, would you receive with your check?

10  A.  The common one, the one that specifies the amount of hours

11  I would work.

12  Q.  And what language was that paper in?

13  A.  In English.  Everything was in English.

14  Q.  Could you understand what that paper said?

15  A.  No.

16  Q.  Besides the hours, what else did it say, if anything?

17  A.  I don't know.

18  Q.  How did you notice that there was a deduction from your

19  tips?

20  A.  The tips were given in daily.  That's when they took off

21  the 15 percent.

22  Q.  But how did you notice that it was a 15 percent?

23  A.  The manager himself told me that they discount -- deduct 15

24  percent.

25  Q.  And to your knowledge, what happens to that 15 percent of

Jb8WmayH                          Mayoral-Climico - Direct

1   the tips that didn't go to you?

2   A.  He told me something about that the company stayed with

3   that, with that portion.

4   Q.  Are you familiar with a person named Richard Schragger?

5   A.  He's the -- Richard Schragger is the man that signed the

6   check, and I heard from Juan that he would come during -- in

7   the evenings.

8   Q.  Just for clarification, I'm asking you about what you know.

9   OK?

10  A.  OK.  OK.

11  Q.  Who was it who gave you your checks?

12  A.  Jaime.

13  Q.  How do you know they were signed by Mr. Schragger?

14  A.  His name was on it.

15  Q.  Have you seen Mr. Schragger in the restaurant?

16  A.  No.

17  Q.  Are you familiar with someone named Alice McLamb?

18  A.  No.  What I have an understanding is they would go in the

19  evenings.  I worked in the mornings.

20  Q.  I see.

21      When -- after you started working what was your wage rate

22  before tips?

23  A.  More or less, six something, seven something.  I don't

24  know.

25  Q.  Six something per what unit -- six or seven something per

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Jb8WmayH                     Mayoral-Climico - Direct

1   what unit time?

2   A.  Per hour.

3   Q.  Was your wage rate the same throughout your employment, or

4   did it change?

5   A.  I think it stayed the same.

6   Q.  On a typical day, how much would you earn in tips before

7   the 15 percent deduction?

8   A.  It varied from around 70 to 120.  But I don't know if they

9   started taking out that 15 percent from the beginning, because

10  I didn't notice it until later.

11  Q.  After you noticed it, what did you notice was the

12  discrepancy between the amount of tips you would receive and

13  the amount of tips you actually got -- or the amount of tips

14  that customers would give you and the amount of tips you

15  actually got on a typical day?

16  A.  I noticed because I was making my own count and noticed

17  that I was getting less.  That's when I asked him, and he

18  answered me.

19  Q.  And what did you notice the discrepancy was?

20  A.  15 percent.

21  Q.  When you were hired and you were told your wage rate, were

22  you told that verbally, in writing, or both?

23  A.  When they hired me I went to one of the Papa John's

24  offices.  They asked me for several things.  I gave it to them,

25  and that's it.  I went with Jaime.

Jb8WmayH                          Mayoral–Climico – Direct

1  Q.  So you gave whoever was at the Papa John's office several

2  items; did they give you any piece of paper?

3  A.  I don't remember.

4  Q.  Have you seen, at Papa John's, any piece of paper in

5  Spanish talking about wages?

6  A.  No.

7  Q.  How did you make your deliveries?

8  A.  I started off with a regular bike, but then I noticed the

9  distances were pretty far.  Sometimes 30, 40 blocks.  Then I

10 bought myself a used electric bike.  Not a new one, a used one.

11 Q.  Did you own that nonelectric bicycle before you started

12 working at Papa John's?

13 A.  Yes.

14 Q.  Why did you buy an electric bicycle?

15 A.  The distances were far.  Get very tired on a regular one.

16 Q.  And did you speak with a manager at Papa John's about

17 purchasing an electric bicycle before you purchased it?

18 A.  Yes.  He was happy about it.  It was better for everyone.

19 Q.  Whose idea was it for you to purchase an electric bicycle?

20 A.  It was my idea.

21 Q.  How much did it cost you?

22 A.  Cost me $1,350.

23 Q.  And you said that Mr. Schragger's name appeared on your

24 checks.  What other names, if any, of persons or entities

25 appeared on your checks?

Jb8WmayH                    Mayoral-Climico

A.   I think only him.  I'm not sure.

Q.   To your knowledge, what was Mr. Schragger doing when he

wasn't visiting Papa John's?

A.   Oh, I don't know.

          MR. SCHWEITZER:  Nothing further.

          THE COURT:  Sir, what is the total amount that you

believe your employer, Papa John, owes you for the work you

performed?  And in asking that question, I'm focusing on the

amount that you're seeking through this lawsuit for the

allegations of unpaid wages and so forth.

          THE WITNESS:  Total?

          THE COURT:  Yes.

          THE WITNESS:  Is 5,000 OK?  I don't know.

          THE COURT:  In this lawsuit you've indicated that on

each week that you were working, you were not paid the total

amount for the time that you worked.  So when I ask what is the

total amount, I'm asking for each week that you say you did not

get the full amount you were owed.  What is it in total that

you believe is owed to you?

          THE WITNESS:  $80, $70.

          THE COURT:  For each week.

          THE WITNESS:  I'm not sure.  I'm note sure.

          A week, I figure it would be 15 percent plus the work

I did inside.  A hundred OK?

          THE COURT:  I'm not asking what would be OK.  I want

Jb8WmayH                    Mayoral-Climico

1    to understand from you, since you have brought this lawsuit

2    claiming that Papa John's did not pay you each week what you

3    were owed, what it is each week that you say you were owed that

4    was not paid to you by Papa John's.

5              THE WITNESS:  300, 400.

6              THE COURT:  In the complaint that was filed by you and

7    the other plaintiffs to begin this lawsuit, it indicates that

8    you purchased a bicycle for $80.  Are you aware of that, sir?

9              THE WITNESS:  Yes.  I started with that bike for a few

10   days.

11             THE COURT:  And is it the case that after only a few

12   days you then purchased the electronic bicycle for $1,350?

13             THE WITNESS:  Yes.

14             THE COURT:  Did you work for Papa John's at any time

15   other than during the year 2014?

16             THE WITNESS:  No.

17             THE COURT:  How many people worked with you at the

18   Papa John's restaurant at 89th Street and Amsterdam Avenue,

19   sir?

20             THE WITNESS:  In the morning it was three, and in the

21   evening was about six more.

22             THE COURT:  In the evening, am I understanding

23   correctly that there were nine persons working; that is, three

24   from the morning and six more?

25             THE WITNESS:  No, no.  The ones in the morning

Jb8WmayH                    Mayoral-Climico

1   finished about six or 7:00.

2            THE COURT:  So when you worked at Papa John's, three

3   persons would be working with you in the morning and six people

4   would be working with you in the afternoon.  Is that correct,

5   sir?

6            THE WITNESS:  Six or more, because it's busier.

7            THE COURT:  How many more beyond six would work with

8   you in the afternoon at Papa John's?

9            THE WITNESS:  I remember it being the pizza guy, two

10  cashiers and six delivery boys.

11           THE COURT:  That would be in the afternoon, correct,

12  sir?

13           THE WITNESS:  Yes.

14           THE COURT:  And in the morning, how many persons do

15  you recall working?

16           THE WITNESS:  It was a pizza guy who take pizza orders

17  and cashier and two delivery guys.

18           THE COURT:  Am I understanding correctly that the

19  person who prepared the pizza would also work the cash

20  register?

21           THE WITNESS:  Yes.

22           THE COURT:  Sir, are you familiar with Rich Foods 37

23  LLC?

24           THE WITNESS:  No.

25           THE COURT:  Do you know what Wonka Holdings Corp. is?

Jb8WmayH                    Mayoral-Climico

1          THE WITNESS:  No.

2          THE COURT:  Other than the bicycles that you've

3    indicated a few moments ago, were there any other things that

4    you purchased or had to purchase to work at Papa John's?

5          THE WITNESS:  The helmet, the vest.  The electric bike

6    already had lights.

7          THE COURT:  The vest to which you made reference, is

8    that for use while using the bicycle?

9          THE WITNESS:  Yes.

10         THE COURT:  Is this a vest that would at night enable

11   a driver in an automobile to observe you riding the bicycle?

12         THE WITNESS:  Yes.

13         THE COURT:  Did you ever use the electric bicycle for

14   purposes other than your work at Papa John?

15         THE WITNESS:  I had another job.

16         THE COURT:  Would you use the vest when using the

17   electric bike at that other job?

18         THE WITNESS:  The vest, no.

19         THE COURT:  The helmet that you used while working at

20   Papa John and using the electric bike, did you use that helmet

21   in connection with your other job where you used the electric

22   bike?

23         THE WITNESS:  No.

24         THE COURT:  All right.  Thank you, sir.

25         THE WITNESS:  Can I go?

1          THE COURT:  Yes, sir.

2          (Witness excused)

3          MR. SCHWEITZER:  Your Honor, before I call Mr. Medel,

4    would it be possible to take a five-minute recess?

5          THE COURT:  Yes.

6          MR. SCHWEITZER:  I need to use the facilities.

7          THE COURT:  We'll be in recess for about five minutes.

8          Mr. Sanchez Andrade, we're going to take a recess for

9    a few moments.  If you need to step away from your seat to

10   stretch your legs for a few moments, you may do so.  But we

11   will continue in a very short time, so do not go too far.

12         (Recess)

13         THE COURT:  Please be seated.

14         Please call your next witness.

15         MR. SCHWEITZER:  Reymundo Molina Medel.

16    REYMUNDO MOLINA MEDEL,

17        Plaintiff, called as a witness in his own behalf,

18        having been duly sworn, testified through the

19        Spanish-language interpreter as follows:

20         THE COURT:  You may inquire.

21   DIRECT EXAMINATION

22   BY MR. SCHWEITZER:

23   Q.  Mr. Medel, are you familiar with a Papa John's restaurant?

24   A.  Yes, I worked there.

25   Q.  Where did you work?

Jb8WmayH                          Medel - Direct

1    A.  12 East 37th Papa John's.

2    Q.  And how did you learn about the job availability at 37th

3    Street Papa John's?

4    A.  My friend worked there, and he told me that they needed

5    people.

6    Q.  And what did you do after hearing that?

7    A.  I went to speak to the manager.

8    Q.  Who was the manager?

9    A.  Fabiola.

10   Q.  Can you spell that, please?

11   A.  F-A-B-I-O-L-A.

12   Q.  When did you first go to speak to Fabiola?

13   A.  I don't remember exactly, but I think it was on a Saturday.

14   Q.  And what year and what month, if you remember?

15   A.  September 2015.

16   Q.  And what did Fabiola say to you about what hours and what

17   schedule you would work?

18   A.  Just in the afternoons.

19   Q.  And what does "in the afternoons" mean?

20   A.  Part time, five to ten or five to two.

21   Q.  When you say five to two, is that five in the evening until

22   two in the morning next day?

23   A.  From five in the evening until two in the morning.  Same

24   thing.

25   Q.  OK.  And what days, if any, did he tell you that you would

Jb8WmayH                         Medel - Direct

1   be working from five until ten and what days, if any, did he

2   tell you that you would be working from five until two?

3   A.  Four days during the week five to ten and weekends five to

4   two.

5   Q.  What day would you have off?

6   A.  I don't remember whether it was Tuesday or Wednesday.

7   Q.  And what, if anything, did Fabiola tell you about your wage

8   rate when he was -- excuse me, when you first came to him?

9   A.  They told me they were going to pay me $6 plus tips.

10  Q.  What, if anything, did Fabiola tell you about the

11  relationship between the $6 and the minimum wage?

12  A.  Didn't tell me anything.  Just told me $6 per hour.

13  Q.  When he told you $6 per hour, did he tell you that

14  verbally, in writing, or both?

15  A.  Verbally.

16  Q.  And did you communicate in English or Spanish?

17  A.  She spoke Spanish.  Spanish.

18  Q.  Do you read English to any degree?

19  A.  No, not too good.

20  Q.  After you were hired, what schedule did you actually work?

21  A.  From five to ten and two days from five to two.

22  Q.  Did there come a time during your employment when your

23  schedule changed?

24  A.  No.  It was always the same.

25  Q.  Was there a method of tracking your time at Papa John's?

Jb8WmayH                          Medel - Direct

1    A.  Well, when a delivery was taken out, they marked how long

2    it takes for me to take the delivery and come back.

3    Q.  And who recorded that?

4    A.  The manager would put the deliveries in the computer.

5    Q.  Was there a method available at Papa John's for you to

6    record what time you came in to work and what time you left

7    work?

8    A.  Yes.

9    Q.  What method was that?

10   A.  Punch.

11   Q.  How soon after you came into work did you punch in?

12   A.  When I -- when I would finish changing into my Papa John's

13   shirt and hat.

14   Q.  And about how long would that take?

15   A.  Five minutes.

16   Q.  About how long after you punched out would you typically

17   leave?

18   A.  I would just change and leave.

19   Q.  What were your duties at Papa John's?

20   A.  We cleaned the pizza shop.  We cut the pizzas, put the

21   toppings on the pizzas.  Sweep and mop.

22   Q.  What had you originally been hired to do, to your

23   knowledge?

24   A.  Just for deliveries.

25   Q.  And how much time during a typical day did you spend doing

Jb8WmayH                          Medel - Direct

1    tasks other than delivery?

2    A.   About two hours.

3    Q.   And for those tasks other than delivery, did you receive

4    tips?

5    A.   No.

6    Q.   After you were hired, what wage rate did you end up being

7    paid?

8    A.   Six per hour.

9    Q.   And how often were you paid?

10   A.   Weekly.

11   Q.   By what method were you paid?

12   A.   Check.

13   Q.   How often did you receive tips?

14   A.   The papers, the Seamless, they would give it to you every

15   eight days.

16   Q.   Is that Seamless, S-E-A-M-L-E-S-S?

17   A.   Seamless, yes.  Yes, the Seamless, the delivery page.

18   Q.   And how did you receive these Seamless tips; by check, by

19   cash, some other way?

20   A.   By check.

21   Q.   When you received your base pay, what, if any, papers came

22   with the check?

23   A.   A check and something that said the hours.

24   Q.   When you say something that says the hours, what language

25   was that piece of paper in?

Jb8WmayH                           Medel - Direct

1    A.  In English.

2    Q.  Could you read and understand what it said?

3    A.  Yes.  It just said the hours.

4    Q.  When you received your tips from Seamless, did you receive

5    any other piece of paper with that pay?

6    A.  They would come together, the hours plus the tips, on the

7    check.

8    Q.  I see.  Did you receive tips other than by Seamless?

9    A.  Just if the customers gave me cash.

10   Q.  And how, if at all, were those tips represented on the

11   paper you received with your check?

12   A.  It didn't say.  It just said the hours, but we knew

13   together with that was the tips.

14   Q.  When you say we knew, how did you know that?

15   A.  Because I knew how many hours I worked.  I saw how much I

16   was getting paid for the hours, and the rest were tips.

17   Q.  Was there a separate line item on the paper for these tips?

18   A.  No.

19   Q.  During your term of employment, did your base pay rate

20   before tips change from what it was when you were hired?

21   A.  Yes, toward the end.

22   Q.  What did it change to?

23   A.  To 10.50.

24   Q.  And when did it change?

25   A.  In January.

Jb8WmayH                         Medel - Direct

1    Q.   Of what year?

2    A.   2017.

3    Q.   How did you learn that your base pay rate changed?

4    A.   There was a meeting, and they told us that they were going

5    to raise our salary.

6    Q.   When you say they, who is they?

7    A.   The owner, the manager and all the workers.

8    Q.   Who was the owner?

9    A.   Richard.

10   Q.   Who was the manager at the time?

11   A.   Fabiola.

12   Q.   And did Richard or Fabiola give you a written notice of

13   your change in wage rate?

14   A.   No.  They just told me.

15   Q.   How do you know Richard?

16   A.   He would always go to the office.  He was in the basement.

17   Q.   And to your knowledge, what would he do?

18   A.   I don't know.  They would -- he would talk to the manager

19   downstairs.

20   Q.   About how long would that talk take, typically?

21   A.   I would say about two hours he'd be there, and then he'd

22   leave.

23   Q.   And how many days a week, approximately, would he come to

24   the restaurant and speak with the manager?

25   A.   I would see him there every day.

Jb8WmayH                          Medel - Direct

1   Q.  When did your employment at Papa John's end?

2   A.  I don't remember whether it was January, February or --

3   2017.

4   Q.  How would you make your deliveries?

5   A.  By bicycle.

6   Q.  Is that a pedal bicycle, electric bicycle, or some other

7   kind of bicycle?

8   A.  Electric.

9   Q.  How many bicycles did you use over the course of your

10  employment at Papa John's from 2015 to 2017?

11  A.  Two.

12  Q.  Were they both electric bicycles?

13  A.  Yes.

14  Q.  Did you own the electric bicycle you first used before you

15  started working at Papa John?

16  A.  No, I brought it to work here.

17  Q.  How much did that cost you?

18  A.  I don't know.  About $600.  It was used.

19  Q.  How did you learn that you were supposed to buy an electric

20  bicycle for use at Papa John's?

21  A.  My friend told me that the deliveries were all pretty far.

22  Q.  How far were they?

23  A.  About 30 blocks.

24  Q.  When you purchased the first electric bicycle, did you

25  purchase any accessories for use with it; for example, a vest

1   or a helmet?

2   A.  Yes, a helmet and a bicycle.

3   Q.  How did you know to purchase a helmet and a vest for use

4   with the electric bicycle?

5   A.  I thought they were supposed to give it.  They didn't give

6   me anything, so I had to buy it.

7   Q.  How did you know that a vest and a helmet were supposed to

8   be used with the electric bicycle?

9   A.  All deliverymen have to use that.

10  Q.  And how do you know that?

11  A.  I've always worked in delivery, and they've always told me

12  I have to use helmets and vests.

13  Q.  What policies, if any, did Papa John's have with regard to

14  safety equipment on the bicycles?

15  A.  I don't understand your question.

16  Q.  Would your manager have let you go out riding a bicycle to

17  make deliveries without the safety equipment?

18  A.  No.  We had to use it.

19  Q.  When did you purchase the second electric bicycle?

20  A.  Around 2016, because the first one that I bought was stolen

21  from me.

22  Q.  How much did it cost you?

23  A.  The same.  I always -- it was also I bought a used one.  It

24  was six, $700.

25  Q.  Who, if anyone, did you tell that the first electric bike

Jb8WmayH                         Medel - Direct

1    had been stolen?

2    A.  No.  No one.

3    Q.  Approximately how much money in total are you seeking out

4    of this lawsuit, to your knowledge?

5    A.  I don't know.  10,000.  I don't know.

6            MR. SCHWEITZER:  Nothing further.

7            THE COURT:  Sir, do you know what Rich Foods 37 LLC

8    is?

9            THE WITNESS:  That's what it said on the checks.

10   Every time I got the check, it said that on there.

11           THE COURT:  Do you know what Wonka Holdings Corp. is?

12           THE WITNESS:  No.

13           THE COURT:  Do you know what Papa Express Inc. means?

14           THE WITNESS:  No.

15           THE COURT:  Do you know what Papa Fresh, Inc. is?

16           THE WITNESS:  No.

17           THE COURT:  You indicated that you wore a Papa John

18   shirt and hat.  How did you acquire the Papa John shirt and hat

19   that you indicated you wore while working?

20           THE WITNESS:  The managers gave it to me.

21           THE COURT:  How many shirts and hats were given to

22   you?

23           THE WITNESS:  One hat and two shirts.

24           THE COURT:  Do you know what Fabiola's full name is?

25           THE WITNESS:  Fabiola Maldonado.

Jb8WmayH                    Medel

1          THE COURT:  The owner whom you identified as Richard,

2    do you know what his full name is?

3          THE WITNESS:  Richard Sholler, something like that.

4          THE COURT:  Did you work at any other Papa John's

5    facility than the one located at 12 East 37th Street?

6          THE WITNESS:  Yes, on 90th Street.

7          THE COURT:  Is that East or West 90th Street?

8          THE WITNESS:  East, on Second Avenue.

9          THE COURT:  When did you work at that location, sir?

10         THE WITNESS:  Towards the end.  Towards the end they

11   moved us over there.

12         THE COURT:  At the 12 East 37th Street Papa John's,

13   how many persons worked there?

14         THE WITNESS:  Delivery people or all, in general?

15         THE COURT:  All of the workers, sir.

16         THE WITNESS:  Pizza guy, cashier, and five

17   deliverymen.

18         THE COURT:  How many persons worked at the Papa John's

19   on East 90th Street and Second Avenue?

20         THE WITNESS:  There, they had two cashiers, two pizza

21   guys, and five delivery.

22         THE COURT:  Thank you, sir.

23         (Witness excused)

24         MR. SCHWEITZER:  No further witnesses, your Honor.

25         THE COURT:  Thank you.

Jb8WmayH

1          Do you wish to submit a posthearing memorandum in

2     support of these plaintiffs' application for damages?

3          MR. SCHWEITZER:  Yes, your Honor.

4          THE COURT:  When do you expect you'll be able to

5     submit that to the Court?

6          MR. SCHWEITZER:  To be frank, your Honor, I have a

7     very full couple of months.  Also -- excuse me.  However, I

8     believe I would be able to submit that by the end of December.

9          THE COURT:  All right.  On or before the 31st day of

10    December, the plaintiffs will submit their posthearing

11    memorandum of law.

12         MR. SCHWEITZER:  Thank you, your Honor.

13         THE COURT:  Is there anything else that we need to

14    address this afternoon?

15         MR. SCHWEITZER:  I don't believe so, your Honor.

16         THE COURT:  Thank you.  Good day.

17         MR. SCHWEITZER:  Thank you, your Honor.

18         THE COURT:  Mr. Sanchez Andrade, we are concluded, and

19    you're free to leave now.

20         THE WITNESS:  OK.

21         (Adjourned)

22

23

24

25

1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3    JOSE CARLOS SANCHEZ ANDRADE

4    Direct By Mr. Schweitzer . . . . . . . . . . . 3

5    SANDRO MAYORAL-CLIMICO

6    Direct By Mr. Schweitzer . . . . . . . . . . .17

7    REYMUNDO MOLINA MEDEL

8    Direct By Mr. Schweitzer . . . . . . . . . . .29

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25